UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Ayad Chirkina,

      Plaintiff,

v.                                                      Case No. 15-12834
                                                        Honorable Sean F. Cox

Warren, City of, *et. al.*,

      Defendants.

_____/

**OPINION & ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT IN PART AND GRANTING IN PART (Doc. #20)**

In this action, Plaintiff Ayad Chirkina ("Plaintiff") brings § 1983 claims against the City

of Warren and one if its police officers, Vahae Engeian, claiming that Defendant Engeian

violated Plaintiff's constitutional right to be free from excessive force. The excessive force

claim stems from Defendant Engeian allegedly applying handcuffs too tightly during Plaintiff's

arrest. Plaintiff also brings a municipal liability claim against the City of Warren.

The matter is currently before the Court on "Defendants' Motion for Summary Judgment

Pursuant to FRCP 56." (Doc. #20, Def.s' Br.). The motion has been fully briefed by the parties

and the Court entertained oral argument as to the motion on August 11, 2016.

For the reasons set forth below, Defendants' Motion for Summary Judgment is **DENIED**

**IN PART and GRANTED IN PART**. The motion is denied to the extent that it seeks dismissal

of Plaintiff's claims against Defendant Engeian. The motion is granted to the extent that it seeks

dismissal of Plaintiff's claims against the City of Warren. Moreover, Plaintiff's request for

spoilation sanctions is **DENIED**.

# BACKGROUND

## I.   Background Facts

### Altercation Between Plaintiff and Female Resident

On August 24, 2013, Plaintiff was at his mother's apartment complex, Harlo Apartments, located in Warren, Michigan.  (Ex. A to Pl.'s Resp., Pl.'s Dep. at 52).  At approximately 3 p.m., Plaintiff left his mother's apartment to take out the trash.  (*Id*.).  Plaintiff testified that an unknown woman, later identified as Sherry Castonguay, approached in her truck as Plaintiff was about to walk across the parking lot.  (*Id*. at 55).  As the woman's truck slowed, Plaintiff assumed that the she was going to let him cross.  (*Id*.).  Instead, the woman proceeded to "gun it," almost hitting Plaintiff with her car.  (*Id*. at 57).  The woman allegedly yelled out, "you terrorist, you Arab, can you walk any slower..." (*Id*. at 55).  Plaintiff testified that the woman took off before he was able to contact the police.  (*Id*. at 57).

### 911 Call Regarding Altercation[1]

At approximately 3:10 p.m., the Warren Police received a 911 call from Sally Azzopardi (formerly, Sally Shipley), the property manager of Harlo Apartments.  (Ex. A to Def.s' Br., 911 Audio Recording; Ex. C. to Def.s' Br., Azzopardi Decl. ¶¶ 4-1).  Azzopardi stated that a female resident informed her of an altercation that had just occurred in the parking lot between the female resident and another male resident.  (*Id*.).  Azzopardi stated that the male resident was threatening the female resident and "flashed a gun that he had on himself." (*Id*.).  Azzopardi described the male as Arabic, with black curly hair, driving a gray Dodge Durango and possibly

---

[1] In support of their motion, Defendants attach an audio recording of the 911 call made by Sally Azzopardi regarding the altercation.  (Ex. A to Def.s' Br., 911 Audio Recording).

2

wearing a blue shirt.  (*Id.*).  Azzopardi advised that the male was standing in the parking lot near his car just minutes before she made the call.  (*Id.*).

Defendant Engeian was provided this information by the 911 dispatcher and was the first police officer to arrive at the apartment complex.  (Ex. D to Def.s' Br., Case Report; Ex. E to Def.'s Br., Engeian Decl. ¶ 3).  Upon his arrival, Defendant Engeian was met by Azzopardi. (Ex. F to Def.s' Br., Engeian Dep. at 16-17; Azzopardi Decl. ¶ 12).  Defendant Engeian testified that Azzopardi pointed Plaintiff out and stated that he had a gun and that he had brandished the gun at another person in the complex.  (Engeian Dep. at 17).

**Defendant Engeian's Arrival**

The parties dispute what transpired upon Defendant Engeian's arrival.  Defendant Engeian explained that the event was not recorded because the audio/video in his squad car was malfunctioning on that day.  (*Id.* at 18; Ex. C to Pl.'s Resp., Engeian Daily Activity Log).

Plaintiff testified that he was standing in the middle of the parking lot when he saw Defendant Engeian point his gun at a neighbor, before running toward Plaintiff.  (Pl.'s Dep. at 69).  Plaintiff explained that Defendant initially "thought I was my neighbor and he thought my neighbor was me."  (*Id.* at 58).  Plaintiff further testified as to the following:

> Q.   And so Officer Engeian then saw you.  What did he do?
>
> A.   He ran up on me with his gun out.
>
> Q.   What did he say?
>
> A.   He said, put your hands up.  Where is the gun?  And I was like, what gun?  I don't have a gun.  And he was like to me, where is the gun?  Where is the gun?  He was really adamant about it like I had it on me.  I was like, I don't have a gun, sir.  I don't have a gun.
>
> Q.   Did you put your hands up?

3

A.     I had my hands up before he even told me to put your hands up.  My hands were up, because I seen him.  He was running toward me with a gun.  So I had my hands up in the air, and he was telling me get on the ground.  And I got on the ground, and he handcuffed me and then he put me in the back of the police car.  And then he asked me was that my truck, and I said, yes, that's my truck, and then he went and searched my truck.

(*Id*. at 66-67).

After Plaintiff was handcuffed, Defendant Engeian patted Plaintiff down in search of a gun.  (Engeian Dep. at 20).  Defendant Engeian did not find a gun.  (*Id*.).  Plaintiff testified that Defendant Engeian then proceeded to lift Plaintiff from the ground with one arm.  (Pl.'s Dep. at 41).  Plaintiff claims that he felt something rip in his lower right back as a result.  (*Id*.).

**Officer Adams And Officer Murray's Arrival**

Approximately five minutes later, Officer Adams and Officer Murray arrived to the scene in the same patrol vehicle.  (*Id*. at 21).  Officer Murray positioned his patrol vehicle near Plaintiff's Dodge Durango for safety reasons.  (Ex. F. to Pl.'s Resp., Murray Dep. at 13).  It is undisputed that, upon arrival, Plaintiff was already detained and in handcuffs.  (Pl.'s Dep. at 67-68; Engeian Dep. at 20; Ex. E to Pl.'s Resp., Adams Dep. at 14; Murray Dep. at 13).

The parties dispute which patrol vehicle Plaintiff was placed in and the record contains conflicting evidence as to this point.  Plaintiff testified that while he could not remember, he "thinks" that Defendant Engeian placed him in the back seat of Defendant's vehicle.  (*Id*. at 68).  Plaintiff later clarified that he was placed in Defendant's vehicle and that he remained in Defendant's vehicle the entire time that his vehicle was being searched.  (*Id*. At 75-76).

While Defendant could not recall the sequence of events, he "believe[s]" that he originally placed Plaintiff in his vehicle, but ultimately "had [Plaintiff] sit in Officer Adams and Murray's vehicle due to [Defendant's] video malfunction."  (Engeian Dep. at 23).

4

Both Officer Adams and Officer Murray testified that upon arrival, Defendant Engeian placed Plaintiff in their patrol vehicle. (Adams Dep. at 14; Murray Dep. at 17). Consistent with this testimony, is information contained in a Case Report created by Defendant subsequent to the incident at issue. (Ex. C to Pl.'s Resp., at PgID 623). In it, Defendant detailed the events that had transpired. Defendant stated that Plaintiff was "placed in the rear seat of 2A40's vehicle" upon being handcuffed and patted down. (*Id*. at PgID 626). Defendant's daily activity log identifies Defendant's vehicle as Unit G01, (*Id*. at 632), while the daily activity log of Officers Adams and Murray identifies their vehicle as Unit 2A40. (*Id*. at PgID 635).

**Search of Plaintiff's Vehicle**

It is undisputed that Defendant Engeian commenced a search of Plaintiff's vehicle.[2] Plaintiff remained in the backseat of a patrol vehicle throughout the duration of the search, which lasted approximately 20 to 30 minutes. (Pl.'s Dep. at 76). Defendant Engeian testified that he detected a strong odor of marijuana as he approached Plaintiff's vehicle and that he observed an unburnt marijuana blunt in the vehicle's front center console. (Engeian Dep. at 21). The marijuana was confiscated and the remainder of Plaintiff's vehicle was searched. (*Id*. at 21-22). During the search, Defendant discovered an object that appeared to be a small gun in its holster in the driver's door pocket. (*Id*. at 21-23). The object was a knife whose blade was slightly less than three inches in length, and whose handle was designed to look like a gun. (*Id*. at 21-23; Ex. I to Def.s' Br., Photographs of Knife).

After Defendant Engeian completed the search of Plaintiff's vehicle, he advised Plaintiff

---

[2] Plaintiff testified that he did not give Defendant Engeian consent to search his vehicle. (Pl.'s Dep. at 68).

5

that he would be issuing a citation for the marijuana. (Pl.'s Dep. at 68). Defendant Engeian further advised that the marijuana and the knife would be taken into evidence. (*Id*.).

### Testimony Regarding Handcuff Complaints

It is undisputed that Plaintiff complained of pain and/or discomfort as a result of Defendant Engeian's application of the handcuffs. However, the parties dispute whether Defendant Engeian responded to Plaintiff's complaints by actually loosening Plaintiff's handcuffs.

The Court notes that neither party adequately fleshes out the sequence of events here. Viewing the evidence in the light most favorable to Plaintiff, the record suggests that Plaintiff could have first complained about his handcuffs within minutes of his arrest and again after Defendant completed a search of Plaintiff's vehicle. Below is a summary of the evidence as it relates to Plaintiff's complaints and Defendant's response.

### a.      Plaintiff's Testimony

Plaintiff testified that when Defendant Engeian first secured and detained him, the handcuffs were on too tight. (Pl.'s Dep. at 78). He testified that "as soon as those handcuffs hit me, I felt the pinches in my wrist. Like I felt like a bee sting. And then after that my hands started swelling, and I'm like in excruciating – I was crying." (*Id*. at 39). According to Plaintiff:

> [Defendant] just grabbed like put them on me. I mean, honestly, he didn't really care if my hands were twisted or not. He just wanted to find a gun, which he didn't find. And, you know, he was not listening to me. I was trying to tell him, Please, Officer Engeian, I'm in a lot of pain. I'm crying to this man. He showed no remorse or sympathy.

(*Id*. at 79). Plaintiff testified that he complained to Defendant Engeian "several times" about the handcuffs: "I was in a lot of pain. I was pleading with him. I was in tears trying to show him

that, please, just loosen them. I'm in pain." (*Id.* at 76).

Plaintiff further testified that his hands felt like they "were getting ready to fall off" and that he was "asking Officer Engeian and everybody else, please, just loosen them up a little bit." (*Id.* at 37). Plaintiff testified that his hands were blue and that his wrists were swollen five times their normal size. (*Id.*).

According to Plaintiff, Defendant Engeian never loosened the handcuffs. Instead, Defendant Engeian "was too busy chatting with his friends and searching my vehicle." (*Id.* at 76). Plaintiff testified that the handcuffs were never loosened until they were ultimately removed. (*Id.*).

### b.       Defendant Engeian's Testimony

Defendant Engeian testified that he recalled Plaintiff complaining that the handcuffs were too tight. (Engeian Dep. at 28). Defendant testified that Plaintiff:

> was constantly trying to . . . spin his hands inside the handcuffs and he ended up locking his wrists so that it was out of alignment with the handcuffs. So when he complained about them, I investigated it, found that he had twisted his hands trying to get out of them, asked him not to move, and I re-adjusted the handcuffs so that it was, once again, comfortable to my original position.

(*Id.* at 28). When asked the specific time that he claims to have loosened Plaintiff's handcuffs, Defendant testified that he loosened them "within a few minutes of handcuffing him." (*Id.* at 41). According to Defendant Engeian, he loosened the handcuffs, placed Plaintiff's hands back in alignment and re-secured the handcuffs. (*Id.*).

### c.       Officer Adams Testimony

Officer Adams testified that he heard Plaintiff complain that his arm was getting numb. (Adams Dep. at 18). According to Officer Adams, Defendant Engeian "took immediate action,

asked him to open the door, asked him to slide to him and he loosened his handcuffs.  Shortly

after that, we had him get out of the car and sit on the curb, so there wouldn't be any more

pressure from leaning up against the back seat."  (*Id.*).  Officer Adams testified that once

Plaintiff was sitting on the curb, he made no further complaints about the handcuffs.  (*Id.* at 20-

21).

###### d.     Officer Murray's Testimony

Officer Murray testified that, after some time in the backseat of the patrol vehicle,

Plaintiff complained about his handcuffs.  (Murray Dep. at 17).  According to Officer Murray,

this was Plaintiff's only complaint.  (*Id.*).  Officer Murray further testified that, upon Plaintiff's

complaint, Defendant Engeian "went into the back and adjusted the handcuffs."  (*Id.*).  Officer

Murray could not recall Plaintiff making any further complaints regarding the handcuffs after he

was removed from the patrol vehicle and seated on the curb.  (*Id.* at 19).

##### Video or Audio Recording

Some of the events at issue in this case were video or audio recorded by a camera affixed

to Officer Adams and Murray's patrol vehicle and the microphone attached to Officer Murray's

uniform.  (Murray Dep. at 7).  In support of their motion, Defendants submitted a copy of that

video, which includes: (1) video footage of Defendant Engeian searching Plaintiff's vehicle; (2)

audio of certain conversations between the officers and Plaintiff; and (3) video footage of

Plaintiff sitting on a curb before his handcuffs were removed and the citation was issued.  (Ex. J

to Def.'s Br., DVD).

The audio turns off and on depending on whether Officer Murray's microphone was

turned on.  Officer Adams testified that their general order states that officers should turn their

8

microphones on when engaged in citizen contact.  (Adams Dep. at 16-17, 19).  Officer Murray

testified, however, that at some points, he accidentally turned his microphone on when it was

supposed to be off and vice versa.  (Murray Dep. at 15-16, 21).

      The Court will refer to the recording below by the second to the time-stamped

information that appears on the tape.  The recording, which is approximately 30 minutes long,

begins with video footage of Defendant Engeian searching Plaintiff's vehicle.  (DVD at 00:26).

At approximately 40 seconds, Plaintiff can be heard yelling about something and Officer Murray

tells Plaintiff to "shut up."  (*Id.* 00:40-00:51; Murray Dep. at 13-14).  Officer Murray then turned

his microphone off[3] and is seen walking away from his patrol vehicle and toward Plaintiff's

vehicle.  (*Id.* at 00:51).

      Shortly thereafter, Defendant Engeian removed the knife from Plaintiff's vehicle.  (*Id.* at

2:14).  Defendant then walked away from the vehicle and out of view.  Defendant returned

approximately seven minutes later and appeared to be removing something else from Plaintiff's

vehicle.  (*Id.* at 9:07).  Defendant then walked away, out of view.  (*Id.* at 10:27).  Soon after, a

second police vehicle can be seen positioning itself in front of Plaintiff's vehicle.  (*Id.* at 10:46).

Defendant can then be seen walking back toward Plaintiff's vehicle and tossing something inside

the vehicle, through the vehicle's window.  (*Id.* at 11:55).  Defendant then walked away from the

vehicle and out of view.

      After the search was completed, at approximately 13 minutes, audio becomes available

again.  Although Plaintiff cannot be seen, he can be heard crying excessively and the officers

attempt to calm him down.  (*Id.* at 13:03).  One officer was assuring Plaintiff that he would not

---

[3] For the following 12 minutes, audio is not available.

be going to jail.  Plaintiff was asked to relax.  After being asked to listen, Plaintiff complained

that he could not feel his arm and that his "arm is numbing up."  (*Id*. at 13:25).  An officer

responded by asking Plaintiff to "quit crying for one second and listen to us."  (13:30).

The following colloquy between Plaintiff and Defendant Engeian subsequently took

place:

| | |
|---|---|
| Defendant: | Listen, when an officer asks you to keep your hands up, alright ... and I believe – when I say I believe you have a gun and you swear out loud and throw your hand toward your pants, what do you think that – do you think that I'm gonna get brave? |
| Plaintiff: | (crying/unintelligible) |
| Defendant: | do you think – listen, do you think that was the right move on your part, sir? |
| Plaintiff: | No, it wasn't ... (crying/unintelligible) |
| Defendant: | Listen, regardless of what you think, your car reeks of marijuana, okay.  You are not a very good stasher 'cause it was sitting right out there, okay.  You're not good at stashing your marijuana. |
| Plaintiff: | (while crying) Sir, I swear I don't sell weed.  I'm not selling weed. |
| Defendant: | I'm not saying you sell weed, sir.  I'm saying your attempt to... I don't know, hide it – hide the marijuana. |
| Plaintiff: | It was there a month ago... I just bought the truck. I swear to god a month ago it smelled like marijuana when I first bought it.  I was buying it because I'm trying to get it fixed. |
| Officer: | Ayad, Ayad, let him finish going through everything and then you, you'll probably be happy with the outcome is going to be ... |
| Defendant: | Listen, listen ... now that we have all our information, like I discussed, once I'm done with my investigation ... listen ... you are going to receive a violation for the marijuana.  That knife is being taken, okay, it's being placed on evidence, alright.  It's being placed on evidence. |
| Plaintiff: | Please... (loud unintelligible cries) |

10

Defendant:     Listen...

Plaintiff:     **My arm, oh my arm, I can't** ...

               (cross talk between officers)

Defendant:     **Stop pulling back on them – stop pulling back on them and they are not going to hurt, okay?**

Plaintiff:     (crying) I just got a ticket the other day...

Defendant:     (to other officers) Lets walk him over ...

Plaintiff:     (crying) Sir, please...

Defendant:     (to other officers) Lets get him out of the car... I think there is a good reason he is on the Xanax.

Plaintiff:     Sir, please don't give me any violations, please.

Defendant:     Slide on out.

Plaintiff:     Please, I beg you...

Defendant:     **I'm going to loosen up the cuffs and I'm going to get you out of the car so you can breathe** and we'll give you your violation, okay? ... come on, come on ... slide out, get your foot out.

Plaintiff:     (crying)

Defendant:     You're having a moment.  I don't want you to have a moment.  **Okay listen, I'm going to loosen them a little bit, alright?**

Plaintiff:     **Oh, my arm... I can't...**

Defendant:     **Stop squirming around, bud**. Okay?

Plaintiff:     Please, I just got a ticket the other day.

Defendant:     Listen ... what did you get a ticket for?

Plaintiff:     For impeding traffic. I – I can't even afford it, I pay all the bills here.  Sir, please don't give me no violation for marijuana, please.  I beg you ...

11

(*Id*. at 14:12 - 17:01) (emphasis added).

Several minutes later, Officer Adams and Officer Murray moved their patrol vehicle and positioned it so that Plaintiff can be observed on camera. This is the first time Plaintiff can be seen. Plaintiff was seated on the curb next to Defendant Engeian's patrol vehicle. (*Id*. at 21:37). Plaintiff was conversing with the officers, but audio is unavailable.

After approximately 10 minutes, Plaintiff was lifted to his feet by Officer Adams. (*Id*. at 28:02). Officer Adams then removed Plaintiff's handcuffs and Defendant Engeian issued Plaintiff the citation. (*Id*. at 28:09; Murray Dep. at 23). When the handcuffs were removed, Plaintiff is seen lifting his shorts, placing his hand on his head, and moving his hands around. (*Id*. at 28:09-29:52).

According to Plaintiff, when the handcuffs were removed, he was trying to flex his hands in an attempt to get blood flow. (Pl.'s Dep. at 78). Plaintiff testified that the tissues on his wrist were torn. (*Id*. at 78-79). Plaintiff admitted that he did not ask Defendant Engeian for medical attention because he "just wanted them away." (*Id*. at 110).

**Medical Records**

At some point after Plaintiff's handcuffs were removed, Plaintiff went to the emergency room at St. John Macomb Oakland Hospital complaining of wrist pain and other injuries. (*Id*. at 80-81). The medical records confirmed tender, swollen wrists and left paraspinal tenderness. (Ex. K to Def.s' Br., Medical Records at Pg ID 295). The medical records ruled out the following injuries: wrist fracture; wrist dislocation; other bone or joint abnormality; hematoma of the head, obvious burn to the head/skin, tenderness of the head, spinal tenderness, and paraspinal bruising/swelling. (*Id*. at Pg ID 295-96, 303).

12

## II.     Procedural Facts

Plaintiff filed this action on August 11, 2015, asserting claims against the City of Warren and Warren Police Officer, Vahae Engeian.  (Doc. #1, Compl.).  Plaintiff's complaint asserts the following two claims: Count I – Violation of the Fourth Amendment, 42 U.S.C. § 1983 Excessive Force; and Count II – Defendant City of Warren's Constitutional Violations. Plaintiff's Count II is a municipal liability claim against the City of Warren and is premised upon a failure-to-train theory.

Following the close of discovery, Defendants filed the instant Motion for Summary Judgment. (Doc. #20, Def.s' Br.).  In it, Defendants argue that Defendant Engeian is entitled to qualified immunity because any force used was objectively reasonable.  (*Id*. at 10).  As to the municipal liability claim, Defendants argue that Plaintiff admitted to not having evidence to support his claims against the City of Warren.  (*Id*. at 7) (citing Pl.'s Dep. at 104-07).

Plaintiff responds that Defendant Engeian violated Plaintiff's Fourth Amendment rights by handcuffing him excessively tight.  (Doc. #29, Pl.'s Resp. at 15–19).  Plaintiff's response brief also seeks "spoilation sanctions" against Defendants.  (*Id*. at 23).

### STANDARD

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

13

*Anderson*, 477 U.S. at 252.

The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High School*, 305 F.3d 520, 526 (6th Cir. 2002). "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by the factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). "This is so because the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." *Id.*

## ANALYSIS

As a threshold matter, the Court notes that Defendants' motion for summary judgment interprets Plaintiff's complaint as making four excessive force claims. However, based upon Plaintiff's response brief and Plaintiff's counsel's position at oral argument, the Court finds that Plaintiff's excessive force claim is based only upon the allegation that Defendant Engeian handcuffed Plaintiff in an unduly tight manner. The Court shall therefore limit its analysis to this issue.

## I.     Plaintiff's Claim Against Defendant Engeian

Plaintiff brings this action under 42 U.S.C. § 1983, seeking to hold Defendant Engeian liable for violating Plaintiff's constitutional right to be free from excessive force. To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: (1) the deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under the color of state law. *Dominguez v. Correctional Medical Services*, 555

F.3d 543, 549 (6th Cir. 2009).

Here, there appears to be no dispute that Defendant Engeian was acting under the color of state law. As such, the Court will focus on the first element of Plaintiff's claim – whether the facts establish a deprivation of a constitutional right.

## A.    Excessive Force

Plaintiff claims that Defendant Engeian "violated Plaintiff's Fourth Amendment rights by handcuffing Plaintiff excessively tight." (Pl.'s Resp. at 15). Plaintiff's excessive force claim is governed by the Fourth Amendment's "objective reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). This inquiry requires "balanc[ing] the consequences to the individual against the government's interests in effecting the seizure." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). Accordingly, it is the Court's role to analyze the challenged conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (internal citations omitted).

### 1.    Plaintiff Has Produced Facts Sufficient To Establish An Unduly Tight/Excessive Handcuffing Claim

The Fourth Amendment "prohibits unduly tight handcuffing." *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005). "Not all allegations of tight handcuffing, however, amount to excessive force." *Id.* In the context of a claim for excessive force by way of unduly tight handcuffing, the Sixth Circuit has determined that:

> In order for a plaintiff's handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: "(1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing."

*Baynes v. Cleland*, 799 F.3d 600, 608 (6th Cir. 2015) (quoting *Morrison v. Bd. of Trs. of Green*

15

*Twp.*, 583 F.3d 394, 399 (6th Cir. 2009)).

Defendants contend that Plaintiff has failed to establish prongs two and three. First, Defendants argue that Plaintiff cannot establish that Defendant Engeian ignored Plaintiff's complaints. Next, Defendants argue that even if a question of fact exists as to the second prong, Plaintiff still fails to establish that some physical injury resulted from the handcuffs.

The Court concludes that Plaintiff has easily established the first and third prongs of the above analysis. With respect to the second prong, the Court acknowledges that it is a closer call. However, upon reviewing the record in a light most favorable to Plaintiff, the Court finds that a question of fact exists as to whether or not Defendant Engeian ignored Plaintiff's complaints.

### i.     Prongs One & Three - Complaints & Physical Injury

Here, there is no question that Plaintiff has established the first prong of the above analysis – that Plaintiff made several complaints regarding the tightness of the handcuffs. Defendants concede, and the deposition testimony/audio recording corroborate Plaintiff's version of events as to this point.

Moreover, despite Defendants' assertions otherwise, Plaintiff has also sufficiently established the third prong of the above analysis – that Plaintiff experienced some physical injury as a result of the handcuffing. Defendants' arguments to the contrary are not persuasive and merely raise issues of disputed facts, which are not appropriate for the Court to decide.[4]

---

[4] For example, Defendant argues that Plaintiff's alleged injuries were the result of Plaintiff awkwardly twisting his wrists within the handcuffs. However, Plaintiff testified that the tightness of the handcuffs caused his injuries, not the placement of his hands. Thus, this is an issue for the jury to resolve. Defendant also argues that after the handcuffs were removed, Plaintiff is observed on video moving his wrists and arms around without difficulty. This goes to credibility – an issue reserved for the jury. Moreover, various reasons exist as to why Plaintiff may not have appeared to be in pain. This does not wholly contradict testimony that his arm was

Plaintiff has testified that his hands were numb, that they turned blue and that they swelled five times their normal size as a result of the tight handcuffs. Plaintiff's medical records confirm swollen wrists. Sixth Circuit precedent establishes that this evidence is sufficient for purposes of summary judgment. *See Baynes*, 799 F.3d at 609 (holding that the plaintiff's testimony that he could not feel his fingers because of the tightness of the handcuffs and that he still experiences periodic numbness in his fingers was sufficient to establish physical injury); *Burchett*, 310 F.3d at 945 (where the Sixth Circuit specifically considered summary judgment of the plaintiff's allegations that his hands were "swollen and blue" while handcuffed and found that such allegations raise concerns of excessive force); *Martin v. Heideman*, 106 F.3d 1308, 1310, 1312-13 (6th Cir. 1997) (reversing the district court's award of qualified immunity and finding complaints that the plaintiff's hands became numb and swollen were sufficient for purposes of physical injury).

### ii.     Prong Two - Complaints Ignored

The closer question becomes whether Plaintiff has presented sufficient evidence to create an issue of fact as to whether Defendant Engeian ignored Plaintiff's complaints. According to Plaintiff, "[t]he evidence in this case clearly shows" that Defendant Engeian "completely ignored [Plaintiff's complaints] until he was released." (Pl.'s Resp. at 17). Plaintiff's brief offers little else in support of this position.

Presumably, Plaintiff is relying on deposition testimony wherein Plaintiff stated that: (1) he complained "several times" to Defendant Engeian regarding pain in his arms as a result of the tight handcuffs; (2) that Plaintiff asked Defendant to loosen the handcuffs; (3) that Defendant

---

numb as a result of the handcuffs or that his hands were blue while handcuffed.

failed to loosen the handcuffs; (4) that Defendant "was too busy chatting with his friends and searching [Plaintiff's] vehicle"; and (5) that the handcuffs were not loosened until they were ultimately removed.

Defendants counter "that it is clear from the video that Officer Engeian did not ignore Plaintiff." (Def.s' Br. at 11). Defendants assert that the "entire process – from the initial complaint to Plaintiff exiting the vehicle to the adjustment of the handcuffs – took barely three minutes. And once adjusted, Plaintiff made no further complaints." (*Id*. at 12). Defendants conclude that "these indisputable facts are fatal to the handcuffing claim and no further inquiry is necessary." (*Id*.). Defendants' position is flawed for a number of reasons.

First, Defendants' argument is premised upon the mistaken assumption that the video/audio recording here depicts the events at issue from start to finish. It is undisputed that the video/audio recording fails to account for the events that transpired directly after Defendant Engeian's arrival to the scene, including Plaintiff's arrest. Additionally, the video provided by Defendants, which is approximately thirty minutes long, is only accompanied by approximately nine minutes of audio. The audio begins after Defendant completed the search of Plaintiff's car and ends when Plaintiff was purportedly removed from a patrol vehicle and seated on a curb. After 21 minutes, Plaintiff appears for the *first* time on the recording. The Court therefore disagrees with Defendants' characterization of the evidence because Defendants incorrectly assume that the "entire process – from the initial complaint to Plaintiff exiting the vehicle to the adjustment of the handcuffs" is captured on video or audio.

Second, in light of the above, Defendants also assume that the complaint heard on the recording was Plaintiff's *first* complaint, *i.e.* that Plaintiff made no complaints until after

18

Defendant Engeian completed a search Plaintiff's vehicle.  However, there is evidence in the record that suggests that Plaintiff could have first complained when he was *initially* handcuffed, which occurred at least 20[5] minutes before the recorded conversation between Plaintiff and Defendant Engeian took place.  For example, at Defendant Engeian's deposition, he was asked:

> Q.     Can you tell me specifically what time you loosened his cuffs?
>
> A.     I believe *within a few minutes of handcuffing him* and that's only because he twisted his wrists around from my original position.

(Engeian Dep. at 41) (emphasis added).  Moreover, Plaintiff's testimony that Defendant failed to loosen the handcuffs because he was too busy *searching* plaintiff's vehicle could also suggest that complaints were made prior to the recorded conversation.  The same can also be said of Plaintiff's testimony that the pain from the handcuffs was *instant* and that Defendant would not listen as Plaintiff tried to tell him that the handcuffs were causing him a lot of pain.

Taken in a light most favorable to Plaintiff, the evidence suggests that Plaintiff's complaints could have been ignored for at least 20 minutes, if not longer, before any conversation between Plaintiff and Defendant Engeian is heard on the audio recording.  And according to Plaintiff's testimony, the handcuffs were not loosened until they were ultimately removed.  This could mean that Plaintiff was subject to tight handcuffs for at least 28-30 minutes.

---

[5] It is undisputed that Plaintiff was already detained and in handcuffs upon the arrival of Officers Adams and Murray.  Plaintiff testified that Officers Adams and Murray arrived approximately five minutes after Defendant Engeian handcuffed him.  The search of Plaintiff's vehicle took place when the other officers were on the scene.  Based on the time stamp on the recording, Plaintiff is first heard complaining at 13:25. Approximately two minutes later, Plaintiff complained again and Defendant Engeian addressed Plaintiff. At 16:34, Defendant advised Plaintiff that he will loosen the handcuffs a little bit. Based upon this time line, Plaintiff was initially handcuffed at least 20 minutes prior to Defendant Engeian first addressing Plaintiff.

This type of delay distinguishes the instant case from cases where courts have found that no constitutional violation existed. *See Burchett*, 310 F.3d at 945 ("[The officer's] prompt response when [the arrestee] finally did complain distinguishes this case from those in which we have found constitutional violations. Until they had notice that the handcuffs were too tight, the officers were unaware of the problem. Once [the arrestee] gave them notice, they immediately acted.").

It is also worth noting that the recorded conversation between Plaintiff and Defendant–where Plaintiff is heard complaining and Defendant is heard addressing Plaintiff–has no bearing on the Court's determination as to this point. Because Plaintiff never appears on camera until he is ultimately seated on the curb, the Court is left to speculate whether or not Plaintiff's handcuffs were actually loosened. Accordingly, Defendant Engeian's statements that he would loosen Plaintiff's handcuffs are not corroborated by any visual evidence and remain disputed by Plaintiff's testimony.

Further, even if the recorded statements conclusively establish that Defendant loosened Plaintiff's handcuffs, which they do not, there still exists a dispute as to whether or not Plaintiff's initial complaints were ignored for at least 20 minutes. Here, a 20 minute delay–while the Plaintiff is detained, compliant[6] and seated in the back seat of a patrol vehicle–is not the type of response that warrants a determination in Defendant Engeian's favor. Accordingly, Plaintiff has presented sufficient evidence to create a factual dispute as to whether Defendant Engeian

---

[6] Plaintiff alleged he was compliant and did not physically resist arrest. Officers Murray and Adams both testified that they did not observe Plaintiff resisting upon their arrival to the scene. Defendant testified that while Plaintiff did not initially comply with his commands, he could not recall Plaintiff offering any physical resistance. (Engeian Dep. at 33-34).

20

ignored Plaintiff's complaints.  The Court therefore concludes that Plaintiff has produced

sufficient evidence to support an excessive force violation.

**II.      Defendant Engeian Is Not Entitled To Qualified Immunity**

Defendants argue that Defendant is entitled to qualified immunity because "his actions

regarding Plaintiff's handcuffs incident to his detention were reasonable."  (Def.s' Br. at 12).

Under the doctrine of qualified immunity, government officials performing discretionary

functions are generally shielded from liability under 42 U.S.C. § 1983 to the extent that "their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Dominguez*, 555 F.3d at 549.

To determine whether a government official is entitled to qualified immunity, the court

must consider two questions.  "First, viewing the facts in the light most favorable to the plaintiff,

has the plaintiff [] shown that a constitutional violation has occurred?  Second, was the right

clearly established at the time of the violation?"  *Phillips v. Roane County*, 534 F.3d 531, 538-39

(6th Cir. 2008).  "The court may address these prongs in any order, and if the plaintiff cannot

make both showings, the [defendant] is entitled to qualified immunity."  *Brown v. Lewis*, 779

F.3d 401, 412 (6th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

**A.      Plaintiff Has Established A Constitutional Violation**

The Sixth Circuit has "consistently held [that] the Fourth Amendment prohibits unduly

tight or excessively forceful handcuffing in the course of an arrest."  *Baynes*, 799 F.3d at 610.

The Court finds that Plaintiff has shown that a constitutional violation has occurred for the same

reasons the Court concluded that Plaintiff's excessive force claim survives summary judgment.

*Id.* ("Under the same reasoning, for purposes of qualified immunity analysis, viewing the facts in

the light most favorable to him, [Plaintiff] has shown that a constitutional violation occurred.").

> **B.    Plaintiff's Right To Be Free From Unduly Tight Handcuffing Was Clearly Established At The Time Of The Violation**

A right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The purpose of the 'clearly established' prong, clarified by the Supreme Court's decision in *Hope v. Pelzer*, is to ensure that officials are on notice that their alleged conduct was unconstitutional." *Baynes*, 799 F.3d at 610 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). In *Baynes*, the Sixth Circuit has recently reiterated that:

> The extent of case law in this Circuit **suffices to put a reasonable officer on notice that excessively forceful or unduly tight handcuffing is a constitutional violation under the Fourth Amendment**. The cases in this Circuit place it beyond peradventure that such a right exists; thus, the law is sufficiently clear for the purpose of the clearly established prong of the qualified immunity analysis. These cases define the right that is clearly established not at a high level of generality or on the basis of a broad historical proposition, *see al-Kidd*, 131 S.Ct. at 2084, but rather, in a particularized context: excessively forceful or unduly tight handcuffing, a type of excessive force, is a type of Fourth Amendment violation, which, in turn, is a constitutional violation.

*Id.* at 614 (emphasis added).

In arguing that Defendant Engeian is entitled to qualified immunity, Defendants contend that Engeian loosened Plaintiff's handcuffs within minutes of his initial complaint. Defendants then point to the Sixth Circuit's unpublished decision in *Fettes v. Hendershot*, 375 F. App'x 528, 533 (6th Cir. 2010), for the proposition that "a constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are 'too tight' is neither reasonable nor clearly established." (Def.s' Br. at 12 n.5).

Defendant's reliance on *Fettes* is misplaced.  First, as mentioned earlier, Defendants' argument suffers from the mistaken assumption that the audio recording accurately reflects how the events at issue transpired from beginning to end.  This is not the case.

Second, *Fettes* is factually distinct.  In *Fettes*, the Sixth Circuit held that the defendants were entitled to qualified immunity because a reasonable officer would not have known that failing to respond to a single complaint about tight handcuffs during a ten-minute drive violated the constitution.  *Fettes*, 375 F. App'x at 533.  The Sixth Circuit reasoned that the "decision not to pull over the vehicle and readjust Fettes's handcuffs during the ten-minute trip to the station falls in the 'hazy border between excessive and acceptable force' along which qualified immunity operates to shield officers from discretionary, on-the-spot judgments."  *Id.* at 534.

Here, unlike the plaintiff in *Fettes*, Plaintiff did not complain about his handcuffs while being transported in a patrol vehicle.  Instead, Plaintiff was detained and seated in the back seat of a parked patrol vehicle.  Moreover, there is evidence in the record that suggests that Plaintiff's complaints were ignored for at least 20 minutes, unlike the ten minutes at issue in *Fettes*.  And finally, unlike the plaintiff in *Fettes*, Plaintiff here complained "several times."  The instant facts are more analogous to cases in which the Sixth Circuit has denied qualified immunity.  *See e.g. Martin v. Heideman*, 106 F.3d 1308, 1310, 1313 (6th Cir. 1997) (held that a genuine issue of material fact existed as to whether officer used excessive force where the plaintiff alleged he was handcuffed too tightly despite making multiple complaints to the defendant and that the handcuffs were not loosened for 35 minutes).

Third, the Sixth Circuit has advised that *Fettes* is an outlier decision in this circuit and has cautioned that the *Fettes* decision "failed to follow the dictates of the [Supreme Court's

23

decision in] *Hope* and broke from earlier, controlling precedent of this Circuit, in a manner that was not necessitated by any intervening change in governing law." *Baynes*, 799 F.3d at 617.

Here, Plaintiff testified that he complained that the handcuffs were too tight, that he was in pain and that he pleaded with Defendant to loosen them. Plaintiff further testified that Defendant did not loosen the handcuffs until they were ultimately removed. Rather than address Plaintiff's complaints, Plaintiff testified that Defendant proceeded to search Plaintiff's vehicle and chat with the other officers on the scene.

Viewing the facts and all inferences in the light most favorable to Plaintiff, and considering the relevant case law, the Court finds that there is sufficient evidence to establish a dispute as to whether it would be clear to a reasonable officer that Defendant Engeian's conduct was unlawful in the situation he confronted.

## III.    Plaintiff Has Not Established a Claim of Municipal Liability

Count II of Plaintiff's complaint seeks to hold the City of Warren liable for the alleged constitutional violations by Defendant Engeian. The Court concludes that Plaintiff has failed to establish municipal liability here. A municipality "be held liable under § 1983 if it maintained a policy or custom that caused the violation" of the plaintiff's rights. *Harvey v. Campbell County*, 453 Fed. App'x 557, 562 (6th Cir. 2011). "A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must identify the policy, connect the policy to the County itself and show that the particular injury was incurred because of the execution of that policy." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004).

Here, Plaintiff does not base his claim against the City of Warren on any actual custom or policy. Instead, Plaintiff's § 1983 claim is a claim predicated upon a "failure to train" theory of

24

municipal liability.  In limited circumstances, a local government's failure to train police officers may be deemed a "policy or custom" for purposes of municipal liability.  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  "[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.*

In order for Plaintiff to establish deliberate indifference, he "must show prior instances of unconstitutional conduct demonstrating that the [City of Warren] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."  *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).

Plaintiff argues that the City of Warren's failure to conduct performance evaluations permits officers to continuously violate constitutional rights.  (Pl.'s Resp. at 22).  This, according to Plaintiff, is evidence of deliberate indifference.  (*Id.*).  In making this argument, Plaintiff mistakenly relies on *Kammeyer v. City of Sharonville*, 311 F. Supp. 2d 653 (S.D. Ohio December 16, 2003).  The facts in *Kammeyer* are easily distinguishable from the facts here.  And unlike the plaintiffs in *Kammeyer*, Plaintiff here has not shown that the City of Warren was aware of prior unconstitutional actions by its officers and failed to subsequently respond.

Moreover, Plaintiff has also failed to point to any official or unwritten policy or any specific defect in training.  Nor has Plaintiff even suggested, for example, that the number of handcuffing incidents in the city of Warren is greater than is to be expected from a properly-trained agency.  Thus, the Court concludes that the City of Warren is entitled to summary judgment as to Count II of Plaintiff's complaint.

**IV.    Plaintiff's Request For "Spoilation Sanctions" Should Be Denied**

In his response brief, Plaintiff contends that "spoilation sanctions are appropriate" because Defendant Engeian's "video and audio has mysteriously disappeared." (Pl.'s Resp. at 23). Plaintiff argues that "Defendants have no explanation for the missing electronic evidence, no offer of proof demonstrating that the equipment was not working, or otherwise explaining the absences of the recorded materials." (*Id.*) Plaintiff's request for sanctions is without merit and is denied.

"[I]t is within a district court's inherent power to exercise broad discretion in imposing sanctions based on spoliated evidence." *Adkins v. Wolever*, 554 F.3d 650, 653 (6th Cir. 2009). A party seeking an adverse inference instruction based on the destruction of evidence must establish that: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010).

Plaintiff's argument is fatally flawed: the evidence that Plaintiff alleges was destroyed *never* existed. The record before the Court establishes that the video and audio in Defendant Engeian's patrol vehicle were malfunctioning on the date in question. Plaintiff has not offered evidence to dispute this. Thus, Defendants could not have destroyed evidence that did not exist in the first place. As such, the Court need not engage in any further analysis. Plaintiff's request is denied.

## CONCLUSION & ORDER

For the foregoing reasons, **IT IS ORDERED** that Defendants' Motion for Summary

26

Judgment is **DENIED IN PART** and **GRANTED IN PART.**  The motion is denied to the extent that Defendants seek summary judgment as to Defendant Engeian.  The motion is granted to the extent that Defendants seek dismissal of Plaintiff's claims against the City of Warren.

Accordingly, Count II of Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's request for spoilation sanctions is **DENIED**.

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  September 27, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 27, 2016, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager